# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SHAWN ANTHONY GONZALEZ,

     Plaintiff,

v.                                                                    CIV No. 12-834 RB/GBW

TEX A. JOEY, RONALD MARTIN, JAVIER
ARCHULETA, and ROBERT MENDOZA,

     Defendants.

## **PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter is before the Court on Defendants' *Martinez* Report and Motion for Summary Judgment (*docs. 29, 30*), Plaintiff's Motion for Writ of Mandamus (*doc. 32*), and Plaintiff's Motion for Jury Demand (*doc. 38*).  Having reviewed the relevant briefing and applicable law, and being otherwise fully advised, I recommend granting Defendants' Motion for Summary Judgment, dismissing Plaintiff's amended complaint with prejudice, denying his Motion for Writ of Mandamus without prejudice, and denying as moot his Motion for Jury Demand.

I.    BACKGROUND

A.  Procedural History

Plaintiff is a state prisoner in the custody of the New Mexico Corrections

Department and was, at all relevant times, housed at the Penitentiary of New Mexico

Correctional Facility in Santa Fe.  *Doc. 20* at 2.  On July 30, 2012, Plaintiff filed a

complaint against James Lopez and Jerry Roark pursuant to 42 U.S.C. § 1983, alleging

violations of his First and Fourteenth Amendment rights.  *Doc. 1.*

On February 7, 2013, the Court dismissed Plaintiff's claims against Defendant

Roark, the director of adult prisons, and Defendant Lopez, the prison warden because

Plaintiff failed to allege an "affirmative link" between these Defendants and any alleged

constitutional violation.  *Doc. 12.*

Pursuant to the Court's order, Plaintiff filed an amended complaint bringing

claims against Tex A. Joey, the Native American Programs Coordinator for the New

Mexico Corrections Department ("NMCD"); Ronald Martin, a NMCD Corrections

Officer assigned to the Security Threat Intelligence Unit ("STIU"); Javier Archuleta, an

NMCD Corrections Officer; and Robert Mendoza, an NMCD Grievance Officer.  *Docs.*

*13, 14.*[1]  Plaintiff's amended complaint concerns two primary subjects: (1) his efforts to

gain access to Native American programming based on his alleged status as "a sincere

---

[1] The Court has construed Documents 13 and 14 together as Plaintiff's amended civil rights complaint.
*See doc. 15.*

practitioner of Anahuac theology" or "Mexicanahuallotl," (*doc. 29*, Ex. B-1 at 000159,

000188) and (2) the confiscation of his composition notebook that he claims contained

religious material.

Defendants filed a *Martinez* report on November 4, 2013, in which they moved

for summary judgment on all of Plaintiff's claims.  *Docs. 29, 30*.  Plaintiff responded on

November 13, 2013, (*doc. 33*), and Defendants filed their reply on November 25, 2013,

(*doc. 34*).

On November 12, 2013, before briefing on Defendant's *Martinez* Report and

Motion for Summary Judgment was complete, Plaintiff filed a Motion for Writ of

Mandamus.  *Doc. 32*.  In this filing, Plaintiff raises claims that "unidentified

participants," including the "mail room supervisor" and members of the "publication

review panel" at NMCD retaliated against him by preventing him from obtaining

research materials for this litigation that had been mailed to him.  *Doc. 32* at 2-4.

Defendants did not respond to this motion.

The Court ordered supplemental briefing on the Motion for Summary Judgment

on May 2, 2014.  *Doc. 39*.  Supplemental briefing was complete on July 8, 2014.  *Docs. 40,

41, 42*.

B. **Plaintiff's Amended Complaint**[2]

1. *Denial of Participation in Native American Programming*

The first subject of Plaintiff's amended complaint concerns Defendant Joey's denial of Plaintiff's requests to participate in Native American programming. *See generally doc. 13.* Plaintiff claims that, by denying this request, Defendant Joey violated Plaintiff's First Amendment right to freely exercise his religion, violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), and violated his Fourteenth Amendment right to equal protection. *See generally doc. 13.* He further accuses Defendant Joey of violating his constitutional rights by failing to promptly respond to his requests to participate in Native American programming. *Doc. 13 at 5.*

Plaintiff has reported four different religions during his tenure with the NMCD. Plaintiff initially reported his religious preference to NMCD as Christian in 2001. *See Doc. 29*, Ex. B-3 at 000253, 000265. On August 19, 2009, Plaintiff submitted his first inmate request to participate in Native American programming. *Doc. 29*, Ex. B-1 at 000170. He alleged that he was a member of the Ysleta Del Sur Pueblo[3] in El Paso, Texas, stated that he was 16% Native American, and provided the Chaplain's Office

---

[2] Unless otherwise indicated, the facts in this section are undisputed.

[3] While Plaintiff's request to participate in Native American programming based on his membership in the Ysleta Del Sur Pueblo does not explicitly state that he seeks to change his religious affiliation, it does request that he be authorized to attend the "sweat lodge," a "Native American Spiritual Ceremon[y]." *Doc. 29*, Ex. B-1 at 000158, 000170. For ease of reference, the Court will therefore treat this "request to participate in Native American Sweat Lodge ceremonies" as a request to change his religious affiliation. *Doc. 29*, Ex. B-1 at 000158.

with a registration number.  *Id.*; Ex. D at ¶ 6(a).  However, further investigation

revealed that it belonged to a different individual.  *Id.*; Ex. D at ¶ 6(a).  A few weeks

later, a member of the prison's Chaplain's Office provided Plaintiff with application

information so that he could enroll in the Ysleta Del Sur Pueblo.  *Doc. 29*, Ex. E-1.

Plaintiff never attempted to do so.

On September 28, 2009, Plaintiff submitted another request to participate in

Native American programming and attempted to change his religion to

"Nahua/Nahuatlaca Mexica."  *Doc. 29*, Ex. B-3 at 000251-53.  He was informed that

NMCD did not recognize this religion.  *Doc. 29*, Ex. B-1 at 000176.  He was also advised

that he would need to provide proof of "Indian Blood" in order to participate in Native

American Spiritual Ceremonies.  *Doc. 29*, Ex. C-1.  Although Plaintiff had yet to provide

anything to corroborate his alleged Native American status, he requested, and was

granted, a 90-day grace period for participation in Native American programming on

January 5, 2010.  *Doc. 29*, Ex. B-1 at 000174.

Shortly after the expiration of his 90-day grace period, Plaintiff again changed his

religious affiliation, this time claiming to belong to a religion known as

"Mexicanahuallotl."  *Doc. 29*, Ex. D at ¶ 6(e); Ex. B-1 at 000188.  In his May 17, 2011 and

July 8, 2011 requests to change his religious preference, he averred that he had sincerely

practiced this faith for fifteen years.  *Doc. 29*, Ex. B-1 at 000188.  The Chaplain's Office

advised Plaintiff that NMCD did not recognize this religion, and denied his request. *Doc. 29*, Ex. C at ¶ 14.

Plaintiff filed two grievances related to his requests to participate in Native American programming.  On May 23, 2011, he filed NMCD Grievance No. 11-06-01, in which he requested both that Mexicanauallotl be recognized as a religion and that he be granted full participation in Native American programming.   *Doc. 29*, Ex. B-3 at 000255.  This grievance was appealed and ultimately denied on July 6, 2012.  *Id.* at 000230.  Plaintiff's second grievance, No. 11-10-02, was submitted on October 11, 2011. *Doc. 29*, Ex. B-1 at 000155.  He claims that his initial grievance was never addressed and alleges that he was therefore hindered from exhausting institutional remedies.  *Id.* Plaintiff's second grievance was appealed and denied on July 6, 2012.  *Id.* at 000154.

### 2.  *Confiscation of Plaintiff's Composition Notebook*

Plaintiff's second set of claims concerns the confiscation of his composition book on July 17 or 18, 2012.  *See generally doc. 14*.  In 2012, the NMCD Security Threat Intelligence Unit (STIU) was conducting an investigation into the prison gang known as Sureños.  *Doc. 30*, Ex. F at ¶ 7(a), (g).  Defendant Martin was an officer with the STIU at the time.  *Id.* at ¶ 7(a), (b).  Around July 12, 2012, Defendant Martin learned through an interview with a confidential informant that the Sureños gang had been using codes and obscure languages such as Nahuatl to communicate.  *Id.* at ¶ 7(f).  Around July 18,

6

2012, Defendant Archuleta physically entered Plaintiff's cell during a facility-wide shakedown and removed a composition book belonging to Plaintiff, which included a Nahuatl dictionary and other gang identifiers such as recitations of gang rules.  *Doc. 29*, Ex. G at ¶ 7-8; *doc. 30*, Ex. F-2 at 000369-79; Ex. F-4 at 000525.  Plaintiff had previously admitted to being an inactive member of the Sureños gang.  *Doc. 30*, Ex. F-3 at 000445, 447, 460.

Defendant Archuleta turned the composition book over to Defendant Martin, who designated it as gang-related contraband.  *Id.* at ¶ 10; *Doc. 30*, Ex. F at 7(g).

Plaintiff submitted Grievance No. 12-08-02 regarding the confiscation of his composition notebook on or around August 22, 2012.[4]  He alleges that his notebook was religious in nature because it contained prayers, theology, and information on Mexican cultural studies and shamanism.  *Doc. 14* at 4.  It also included a Nahuatl/English dictionary, personal writings from over ten years, and Plaintiff's telephone and address book.  *Doc. 14* at 4.

In his federal complaint, Plaintiff contends that his composition book was taken in violation of his right to due process, and in retaliation for his filing grievances regarding participation in Native American programming.  *See generally doc. 14*.  He states that his notebook was confiscated on either July 17 or 18, 2012, less than two weeks after he had exhausted administrative remedies regarding his denial of Native

---

[4] The first page of Plaintiff's grievance, which indicated the date, has since been lost.  *Doc. 29*, Ex. B-4 at 000267.

American programming and stated his intention to file suit in the instant matter.  *See doc. 29*, Ex. B-1 at 000154.  Plaintiff also claims that Defendant Mendoza, the grievance officer, did not thoroughly investigate or address Plaintiff's grievance, and therefore violated his due process and equal protection rights, as well as his First Amendment rights. *Doc. 14* at 7-8.  Plaintiff's grievance regarding the confiscation of his materials was appealed and ultimately denied on December 13, 2012.  *Doc. 29*, Ex. B-4 at 000266.

### 3.  *Defendants' Motion for Summary Judgment*

In their *Martinez* Report, Defendants move for summary judgment as to all claims in Plaintiff's amended complaint.  They raise a number of defenses, including Plaintiff's alleged failure to exhaust administrative remedies.  *See generally doc. 29*.  With respect to the merits of Plaintiff's claims, Defendants primarily contend that Plaintiff is not a sincere practitioner of Mexicanahuallotl, but instead seeks to participate in Native American programming in order to gain influence within the Sureños prison gang.

### II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before proceeding to the merits of Plaintiff's amended complaint, the Court must establish whether he has properly exhausted all of his claims.  Barring exceptional circumstances, before a complaining prisoner may proceed with a § 1983 claim in federal court, the Prison Litigation Reform Act (PLRA) requires that he exhaust all available administrative remedies.   42 U.S.C. § 1997e(a) (1996) ("No action shall be

8

brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The Supreme Court has held that this provision requires "proper exhaustion" in compliance with the prison's grievance procedure—that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  Prisoners must exhaust all available remedies even if those remedies "appear to be futile at providing the kind of remedy sought." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).  The exhaustion requirement is mandatory and no longer within the discretion of the district court.  *Woodford*, 548 U.S. at 85.

Exhaustion has two main purposes: (1) to protect administrative agency authority and give the agency an opportunity to correct its own mistakes; and (2) to promote efficiency, as claims "can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.* at 89.  The benefits of exhaustion can therefore only be realized if the prison "is given a fair opportunity to consider the grievance." *Id.* at 95.  In general, "a grievance will satisfy the exhaustion requirement so long as it is not 'so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.'" *Kikumura v. Osagie,* 461 F.3d

1269, 1283 (10th Cir. 2006), *overruled on other grounds by Robbins v. Oklahoma,* 519 F.3d

1242 (10th Cir. 2008) (internal quotations omitted).

### A. Plaintiff Has Properly Exhausted All Claims in his Amended Complaint (*Docs. 13, 14*)

Defendants allege that, with the exception of his First Amendment claims against

Defendant Joey, Plaintiff failed to comply with the prison's grievance procedures and

therefore failed to exhaust his administrative remedies.  Although Plaintiff completed

the three-step appeal process[5] for each of his grievances,[6] Defendants contend that he

did not comply with sections A.1 or A.6 of New Mexico Corrections Policy CD-

150500/01.  Section A.1 requires that the inmate "explain in detail his/her complaint,"

and Section A.6 states that "[t]he inmate must complete a separate grievance form for

each issue grieved."  *Doc. 29*, Ex. A-6 at 000097, 000098.  Defendants contend that

Plaintiff's grievances were not properly exhausted because they consist of "multiple

broad allegations" unsupported by specific facts, and therefore did not comply with the

policy on inmate grievances.  *Doc. 29* at 8.

---

[5] An inmate must first file an informal complaint within five calendar days of the date of the incident. Next, if the complaint fails to resolve the issue, the inmate may file a formal grievance within 20 calendar days of the date of the incident.  A grievance officer will conduct an investigation and make a recommendation to the warden.  Finally, if the inmate is not satisfied with the warden's decision, he may appeal the decision to the Office of the Secretary of Corrections.  *Doc. 29*, Ex. A-6 at 000097-100.

[6] Plaintiff filed three grievances relevant to this complaint.  Grievance Nos. N-11-10-01 and N-11-10-02 concern Plaintiff's religious status and participation in Native American programming, and Grievance No. N-12-08-02 concerns the confiscation of Plaintiff's composition notebook.  *Doc. 29*, Ex. B-1, B-3, B-4.

The Court disagrees.  Generally, if a prison considers an inmate's grievances on the merits throughout all steps of the grievance process, the inmate has exhausted his administrative remedies.  *See, e.g., Ross v. County of Bernalillo*, 365 F.3d 1181, 1186 (10th Cir. 2004) (concluding that, when a prison accepts a belated filing but proceeds to consider the grievance on the merits, the grievance will be considered properly exhausted) *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007).  This may be true even if the grievances did not fully comply with the prison's grievance policy.

In contrast, in cases where a prisoner was found to have failed to exhaust for not complying with the prison's grievance policy, he was typically informed of a deficiency in his grievance and, instead of curing the deficiency, proceeded to file a claim in federal court.  *See, e.g., Thomas v. Parker*, 609 F.3d 1114, 1117-18 (10th Cir. 2010) (finding failure to exhaust where prisoner's grievances were returned as insufficient and he was warned that "incorrectly submitted appeals would be returned without a response."); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (finding prisoner had failed to exhaust administrative remedies when he was notified of the deficiency in his grievance and given time to cure, but chose to file a lawsuit instead of attempting to cure).

Here, however, there is no indication that Plaintiff was ever told his grievances were insufficient.  Rather, the prison chose to consider them on the merits throughout the appeals process.

Further, the Court believes that, considering the requirement to construe a *pro se* plaintiff's pleadings broadly, Plaintiff did, in fact, comply with sections A.1 or A.6 of New Mexico Corrections Policy regarding inmate grievances.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  Plaintiff filed separate grievances regarding access to Native American programming and the confiscation of his composition notebook, and explained his allegations clearly enough to enable prison personnel to address his complaints at each step of the process.  *See Kikumura,* 461 F.3d at 1285 (concluding prisoner exhausted administrative remedies where his grievance "was sufficient to enable prison officials to investigate [his] complaint," even though he did not name all the defendants).

For the foregoing reasons, the Court finds that Plaintiff gave Defendants a full and fair opportunity to address his grievances, and therefore properly exhausted his administrative remedies.

    B.  <u>Plaintiff Has Not Exhausted the Claims Alleged in his Motion for Writ of Mandamus (*Doc. 32*).</u>

On the other hand, Plaintiff did not exhaust the claims raised in his Motion for Writ of Mandamus.  *Doc. 32*.  In this filing, he alleges that "unidentified participants" retaliated against him for filing the instant action by denying him access to legal materials.  *Doc. 32* at 2-4.  In particular, he claims that research materials mailed to Plaintiff for use in this case were improperly withheld from him by the "mail room

supervisor" and "publication review panel."  *Id.*  Plaintiff offers no evidence that he ever filed a grievance regarding this issue, much less that he exhausted his institutional remedies.  I therefore recommend denying in his Motion for Writ of Mandamus for failure to exhaust administrative remedies.

### III.     STANDARD OF REVIEW ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) mandates dismissal where, upon consideration of all the briefing before the court, no genuine issue as to any material fact exists, and, based on that briefing, the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).   The Court must construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).

Summary judgment may be reached on the "pleadings, depositions, answers to interrogatories, and admissions on file" alone.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact.  *Id.* at 323.  Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).  The opposing party must

present more than conjecture and conclusory statements to defeat a summary judgment motion.  *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991).  "On summary judgment, a *Martinez* report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir.1992).  A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111.  A court may not rely on a *Martinez* report to resolve material disputed facts where it is in conflict with pleadings or affidavits, nor can material factual disputes be resolved based on conflicting affidavits.  *Id.* at 1109, 1111.  A factual dispute exists even when the plaintiff's factual allegations in conflict with the *Martinez* Report are less specific or well-documented than the factual findings in the *Martinez* Report.  *Id.* at 1109.

The Court is mindful that, when evaluating the pleadings of a party proceeding *pro se*, a court must liberally construe them and should hold them to a less stringent standard than would be applied to the pleadings of a represented party.  *Hall v. Bellmon*, 935 F.3d 1106, 1110 (10th Cir. 1991).  A court is not required, however, to assume the role of advocate for the *pro se* litigant, nor does the mere fact of appearing *pro se*

alleviate the litigant's burden of presenting sufficient evidence to demonstrate a genuine factual dispute that would allow him to survive summary judgment.  *DiCesare v. Stuart*, 12 F.3d 973, 979 (10th Cir. 1993) ("Pro se litigants are subject to the same rules of procedure that govern other litigants.").

### IV.    CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL & OFFICIAL CAPACITIES

Under 42 U.S.C. § 1983, plaintiffs may bring claims against defendants in both their individual and official capacities.  "[U]nder § 1983 . . . a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents . . . ." *Brandon v. Holt*, 469 U.S. 464, 471 (1985).  "[T]he doctrine of respondeat superior does not apply to actions brought under § 1983." *Winters v. Bd. of Cnty. Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993).  Therefore, to succeed in his § 1983 action against an individual in his official capacity, a plaintiff must show the existence of a custom or policy, the requisite state of mind for the underlying constitutional violation, and a direct causal link between the custom or policy and the alleged violation.  *See Dodds v. Richardson*, 614 F.3d 1185, 1202, 1204 (10th Cir. 2010) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 405 (1997)).  The alleged policy or custom may be express, or it may be implied from the prevalence of alleged constitutional violations or the provision of inadequate training.  *See Sauers v. Salt Lake Cnty.*, 1 F.3d 1122, 1129 (10th Cir. 1993).

Plaintiff does not specify whether he is suing Defendants in their individual or official capacities.  However, Defendants address both types of claims in their *Martinez*

15

report.  *Doc. 29* at 10.  As such, the Court recommends construing Plaintiff's claims as set forth below.

### A.  Claims Against Defendant Joey

Plaintiff brings four claims against Defendant Joey: (1) denial of his First Amendment Right to freely exercise his religion, (2) violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), (3) denial of his right to equal protection under the Fourteenth Amendment, and (4) denial of his right to due process under the Fourteenth Amendment.

Plaintiff's first three claims against Defendant Joey concern the denial of access to Native American programming and challenge the validity of the prison's policy itself. Accordingly, I recommend presuming that Plaintiff intended to allege claims against Defendant Joey in both his individual and official capacities.  *See Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010) ("[O]fficials may be held individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights.").

Plaintiff's fourth claim against Defendant Joey—alleging denial of due process— concerns Defendant Joey's delayed response to Plaintiff's proposal to alter the prison's policy regarding Native American programming.  This claim makes no allusion to any custom or policy and does not otherwise appear to have occurred as a result of such a

custom or policy.  I therefore recommend construing it as a claim against Defendant

Joey in his individual capacity only.

### B.  Claims Against Defendants Martin and Archuleta

Plaintiff's brings five claims against Defendants Martin and Archuleta for the

confiscation of his composition notebook: (1) denial of his First Amendment Right to

freely exercise his religion, (2) violation of RLUIPA, (3) denial of his right to equal

protection under the Fourteenth Amendment, (4) retaliation in violation of the First

Amendment, and (5) denial of his right to due process under the Fourteenth

Amendment.  Plaintiff does not allege that these actions were taken pursuant to any

unconstitutional custom or policy and they do not otherwise appear to have occurred as

a result of such a custom or policy.  I therefore recommend construing Plaintiff's claims

against Defendants Martin and Archuleta as claims against them in their individual

capacities only.

### C.  Claims Against Defendant Mendoza

Finally, Plaintiff brings the following four claims against Defendant Mendoza for

failure to properly consider his grievance: (1) denial of his First Amendment Right to

freely exercise his religion, (2) violation of RLUIPA, (3) denial of his right to equal

protection under the Fourteenth Amendment, and (4) denial of his right to due process

under the Fourteenth Amendment.  Because Plaintiff does not claim that Defendant

Mendoza's actions were due to any unconstitutional custom or policy, I recommend treating these claims as against Defendant Mendoza in his individual capacity only.

V.   ANALYSIS

A.   **First Amendment Free Exercise of Religion & RLUIPA**

   1.   *Claims Against Defendant Joey regarding Denial of Access to Native American Programming*

Plaintiff seeks participation in Native American programming on the basis that the religious beliefs of Mexicanahuallotl are "very similar to [those] of North American Indians . . . ." *Doc. 29*, Ex. B-1 at 000189.  He alleges that, in denying him access to Native American programming, Defendant Joey violated both his First Amendment right to practice his religion and his statutory rights under RLUIPA.  The First Amendment protects an individual's ability to freely exercise his religion.  U.S. Const. amend. I.  Similarly, RLUIPA prevents the government from burdening a prisoner's religious practices unless the burden imposed furthers "a compelling governmental interest" and does so by "the least restrictive means."  42 U.S.C. § 2000cc-1(a) (2000).

Plaintiff must make the same preliminary showing under both the free exercise clause of the First Amendment and RLUIPA.  "[T]o establish a violation of the First Amendment [or] RUILPA, the plaintiff bears the initial burden of demonstrating that the restriction substantially burdened his sincerely held religious beliefs."  *Ford v. Fed. Bureau of Prisons*, No. 08-882, 2011 WL 2415790, at *9 (D. Colo. May 24, 2011) *report and*

*recommendations adopted by Ford v. Fed. Bureau of Prisons*, No. 08-882, 2011 WL 2358166

(D. Colo. June 10, 2011); *see also Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir. 2007).

> a)  *Plaintiff Does Not Have a Sincerely Held Religious Belief*

Defendants insist that Plaintiff's claims must fail because his purported religious

beliefs are not sincerely held.  *Doc. 29* at 12-13.  They contend that Plaintiff is not

motived by a true belief in Mexicanahuallotl, but instead seeks to use his claimed

religion to gain access to Native American programming so as to further his influence

within the Sureños prison gang.  *Doc. 29* at 14.

"A religious belief which is not sincerely held . . . does not require the prison to

consider accommodation."  *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991).

"Without question, [a] prison may determine whether plaintiff's beliefs are sincere," *id.*

at 1526, and, "[t]o the extent the prison officials think that the [] inmates are faking . . .

their . . . religious beliefs . . ., they should feel free to challenge that sincerity."  *Haight v.*

*Thompson*, No. 13-6005, 2014 WL 3973675, at *8 (6th Cir. Aug. 15, 2014).  Courts have

"recognize[d] the very real possibility of an inmate adopting a particular religion or

belief to obtain more favorable treatment or simply to harass prison staff . . . ."  *Benning*

*v. Georgia,* 864 F. Supp. 2d 1358, 1364 (M.D. Ga. 2012).

At the summary judgment stage, dismissal on the ground that a prisoner's beliefs

are not sincere may be appropriate in cases in which the beliefs "are 'so bizarre, so

clearly nonreligious in motivation that they are not entitled to . . . protection.'" *Kay v. Bemis,* 500 F.3d 1214, 1219-20 (10th Cir. 2007) (internal quotation omitted); *see also Mosier*, 937 F.2d at 1526.  When inquiring into sincerity, "the important inquiry [is] what the prisoner claim[s] [is] important to him."  *McAlister v. Livingston*, 348 F. App'x 923, 935 (5th Cir. 2009).  Courts may not require prisoners to adhere to specific doctrinal standards of organized religion nor to establish the "truth" of their beliefs.  *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 790-91 (5th Cir. 2013); *cf. Benning,* 864 F. Supp. 2d at 1364 (declining to consider rabbi's testimony that plaintiff had "not established that he [was] Jewish").  Rather, courts should ask "whether the claimant is . . . seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold . . . ."  *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014).

In making a sincerity determination, courts "look[] to the words and actions of the inmate." *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2013).  In *Ford v. Federal Bureau of Prisons*, for example, the U.S. District Court of Colorado held as a matter of law that a prisoner had "not met his burden to establish a prima facie case regarding whether he has sincere religious beliefs" where defendants "demonstrated with unrefuted evidence . . . that the plaintiff does not comply with all of the dietary practices which *he claims are essential* to his faith."  2011 WL 2415790, at *10 (emphasis added).  The Court of Appeals for the Eleventh Circuit employed analogous reasoning in *Gardner v. Riska,* holding that the prisoner plaintiff did not have a sincere

belief where he acted in contradiction to his claimed religious practices.  444 F. App'x 353 (11th Cir. 2011).  In that case, the plaintiff claimed to follow a Kosher diet for religious reasons, yet had purchased and consumed non-Kosher items from the prison canteen despite the availability of Kosher options.

I recommend finding as a matter of law that Plaintiff does not have a sincere belief in his professed religion of Mexicanahuallotl.  Like the prisoners in *Ford* and *Gardner*, Plaintiff has acted contrary to his professed religious practices and has made inconsistent statements regarding both his background and religion.

During the course of his incarceration, Plaintiff has claimed to be a member of four different religions— Christianity, Ysleta Del Sur Pueblo, Nahua, and Mexicanahuallotl—and has attempted to change his professed religion three times within the span of less than two years.  If these vagaries were not enough to find Plaintiff's beliefs insincere, his own "words and actions" lend further support to this finding.  *Moussazadeh*, 703 F.3d at 791.  Plaintiff has provided false information and contradictory statements to prison officials with respect to his religion and background in attempts to gain access to Native American programming.  He has failed to present any evidence—other than his own, unsubstantiated claims—that his beliefs are sincerely held.  Furthermore, Defendants have good cause for suspecting ulterior motives due to Plaintiff's prior involvement in the Sureños gang.

i.   <u>Plaintiff has provided contradictory information regarding his religion</u>

Throughout his numerous attempts to gain access to Native American programming at NMCD, Plaintiff has provided prison officials with untrue and contradictory information concerning his religion.  First, Plaintiff gave a false tribal registration number to prison officials in August 2009, when he submitted his first inmate request to gain access to Native American spiritual ceremonies.  *Doc. 29*, Ex. B-1 at 000170.  At that time, he had not yet claimed Mexicanahuallotl as a religion.  He instead alleged that he was a member of the Ysleta Del Sur Pueblo and provided prison officials with his purported registration number.  *Id.*  Shortly thereafter, the Pueblo advised NMCD that the census number Plaintiff had provided did not, in fact, belong to him.  Ex. D at ¶ 6(a).

In the same request form, Plaintiff made statements regarding his heritage that he later contradicted in other documents.  He claimed to have an Ysleta Del Sur Pueblo "blood quantum" of 16%, which constituted "proof of [his] Native American status." *Doc. 29*, Ex. B-1 at 000170.  Plaintiff affirmatively disavowed this statement later, claiming "Mexican ancestry" and stating that his people "*reject* the term 'Native American.'"  *Doc. 29*, Ex. B-3 at 000234 (emphasis added).  On numerous subsequent occasions in his filings and grievances, he continues to affirm that he is actually of indigenous Mexican ancestry.  *See, e.g., doc. 29*, Ex. B-1 at 000202 ("My ancestors are indigenous to this continent; 'Mexican'"); Ex. B-3 at 000236 ("My racial identity is of

Mexican descent as are my heritage, ancestry and culture and religion."); Ex. B-3 at 239

("I am requesting to practice Anahuac theology of my Mexican descent and ancestry.");

Ex. B-3 at 000251 ("I am a blood descendant of the indegenous [sic] inhabitants of this

land . . . I am Mexican American . . . .").

Finally, Plaintiff's allegations that he has been a devout practitioner of

Mexicanahuallotl for more than fifteen years are belied by his own prior statements of

his religious affiliation.  *Doc. 29*, Ex. B-1 at 000188.  It is undisputed that Plaintiff initially

reported his religious preference to NMCD as "Catholic/Christian" in 2001, less than

fifteen years ago. *Doc. 29*, Ex. B-3 at 000253; 000265).  Moreover, he did not report a

change in his religious preference from "Catholic/Christian" until 2009.  *Doc. 29*, Ex. B-3

at 000251-53.  By his own affirmative selections, therefore, Plaintiff could not have been

a sincere practitioner of Mexicanahuallotl for fifteen years.

The fact that the record undermines his claim of sincere belief is particularly

significant because Plaintiff provides nothing but his word on the matter.  Despite

Plaintiff's supposed fifteen years of practicing Mexicanahuallotl and his own awareness

of organized Mexicanahuallotl groups within the United States, he presents no evidence

from another person or group to support his claims.[7]  *See doc. 29*, Ex. C at ¶¶ 12, 14; Ex.

D at ¶ 6(e); Ex. E at ¶ 6(d); *see also doc. 29*, Ex. B-1 at 000189 ("Here in the U.S., there are

several large groups of Mexican-European descent which organize the education and

---

[7] Plaintiff does submit documents to the Court that describe his claimed religion.  *Doc. 33*, Exs. 1-5.  He does not, however, provide any support with respect to the issue of his sincerity.

preservation of Nahua religion and culture.").  Given his complete lack of credibility on the matter and the lack of any evidence beyond his blanket assertions, he fails to bear the initial burden that he holds these beliefs sincerely.

ii.    Plaintiff has a history of involvement with the prison gang Sureños

For their part, Defendants have provided ample evidence that Plaintiff's motivation to participate in Native American programming stems from his involvement in the Sureños prison gang, and not from a genuine religious belief.  It is undisputed that Plaintiff has a long history of involvement with the California Sureños gang. Plaintiff initially self-identified as a prior member of the gang (*doc. 30*, Ex. F-3 at 000445, 447, 460), and informed prison officials that the gang had a "hit" out on him (*doc. 30*, Ex. F at ¶ 7(e); Ex. F-3 at 000427).  Plaintiff's association with Sureños is also evident from his numerous tattoos of images commonly associated with the gang, such as the term "SUR." *Doc. 30*, Ex. F-3 at 000443, 000451.  When asked about his involvement in Sureños, Plaintiff informed prison officials that he was "born into it" and "it's just the way of life." *Doc. 30*, Ex. F-3 at 000445.  This involvement is important here because Defendants have presented evidence[8] that the "symbols and language 'Nahutal' of [Plaintiff's] claimed religion are nothing more than codes used to communicate with

---

[8] This evidence comes in the form of reports admissible under Federal Rule of Civil Procedure 803(8), an exception to the hearsay rule that permits the admission in a civil action of a "record or statement of a public office" that sets forth "factual findings from a legally authorized investigation" unless "the source of information or other circumstances indicate a lack of trustworthiness."  FED. R. EVID. 803(8).

and identify other gang members." *Doc. 29* at 14.  In fact, Plaintiff's confiscated

composition notebook contained a Nahua dictionary (*doc. 30*, Ex. F-4 at 000487), as well

as other information associated with the Sureños gang, such as a list of gang rules

known as the "48 Laws of Power" (*doc. 30*, Ex. F-2 at 000369-79; Ex. F-4 at 000525).

In conclusion, Plaintiff has presented only his own, self-serving statements to

support his claim that he is a sincere practitioner of Mexicanahuallotl.  Those statements

are fatally undermined by his prior false and conflicting statements regarding his

religion and his apparent nonreligious motivations for participating in Native American

programming.  I therefore recommend finding, as a matter of law, that Plaintiff has

failed to bear his burden that his claimed beliefs are sincerely held.  Consequently, I

recommend dismissing his free exercise and RLUIPA claims against Defendant Joey on

that basis.

> ## 2.   *Claims Against Defendants Martin, Archuleta, and Mendoza Regarding the Confiscation of Plaintiff's Composition Book*

Plaintiff alleges that Defendants Martin and Archuleta violated his First

Amendment right to freely exercise his religion and his rights under RLUIPA when

they confiscated his composition notebook that contained Mexicanahuallotl religious

text.  He also brings related claims against Defendant Mendoza for not properly

considering his associated grievance.

Having concluded that Plaintiff has failed to bear his initial burden of establishing a sincere belief in his professed religion of Mexicanahuallotl, his free exercise and RLUIPA claims related to the composition notebook must also fail.  I therefore recommend dismissing his free exercise and RLUIPA claims against Defendants Martin, Archuleta, and Mendoza.

**B.  <u>Equal Protection</u>**

Plaintiff claims that Defendants violated his right to equal protection under the laws when (1) he was denied access to Native American programming based on his Mexican race, and (2) when Defendants confiscated his composition notebook, thereby depriving him of his religious writings.

"To sustain a claim under the Equal Protection Clause, a plaintiff must provide evidence that he was treated differently from others who are similarly situated to him, and that the acts forming the basis of the plaintiff's claim were motivated by a discriminatory purpose."  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157 (10th 2003).  "Equal protection is essentially a direction that all persons similarly situated should be treated alike."  *Trujillo v. Williams,* 465 F.3d 1210, 1228 (10th Cir. 2006) (internal quotations and emphasis omitted).  "[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from

others who were similarly situated to them." *Brown v. Montoya,* 662 F.3d 1152, 1172–73 (10th Cir.2011) (internal quotation marks omitted).

### 1. Claims Against Defendant Joey regarding Denial of Access to Native American Programming

Plaintiff alleges that Defendant Joey unconstitutionally discriminated against him on the basis of his race when he denied Plaintiff access to Native American programming because Plaintiff was unable to prove that he had Native American blood. In support of his claim, Plaintiff cites to *Morrison v. Garraghty*, in which the Fourth Circuit held that the refusal to consider an inmate's request to obtain Native American religious items because he was not of Native American heritage violated the equal protection clause. 239 F.3d 648 (4th Cir. 2001). Plaintiff contends that the NMCD policy, like the policy in *Morrison*, unconstitutionally discriminates on the basis of race.

In *Morrison*, the plaintiff, who was a prisoner, claimed to be a sincere practitioner of a religion with "beliefs similar to those held by Native Americans practicing a tribal-based Native American religion." *Morrison*, 239 F.3d at 652. As such, he requested exemptions from personal property restrictions applicable at the prison. *Id*. at 652-53. The prison refused to even consider his request because his race was not Native American. *Id*. As such, the sincerity of his belief was irrelevant if the prisoner could not prove Native American heritage. *Id*. at 652-57. In fact, the prison official in *Morrison* denied his request stating, "I applaud your sincerity but still need documentation of

your heritage."  *Id*. at 657.  Consequently, the prison was discriminating between sincere believers in Native American Spirituality based solely on their race.  *Id.* (holding based on assumption "that [he] is a sincere practitioner of a . . . religion [that] calls for similar religious property as tribal-based Native American religions").  Those who were Native American were considered for personal property exemptions and those who were not were not considered.  *Id*.  Unsurprisingly, the *Morrison* court found that such a policy violated the Equal Protection Clause, which "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Unlike the plaintiff in *Morrison*, however, Plaintiff is not "similarly situated" to Native Americans who practice Native American religions.  As discussed above, he has failed, as a matter of law, to show he is a sincere practitioner of any such religion. Because he cannot show he is similarly situated in all relevant aspects, his equal protection claim regarding access to Native American religious programming must fail. Thus, I recommend dismissing the equal protection claim against Defendant Joey in both his individual and official capacities.

**2.** *Claims Against Defendants Martin, Archuleta, and Mendoza*
*Regarding the Confiscation of Plaintiff's Composition Book*

Plaintiff claims that Defendants Martin, Archuleta, and Mendoza discriminated

against him on the basis of his race and religion when they confiscated his composition

notebook.  To establish an equal protection claim for the confiscation, Plaintiff

> must demonstrate that the defendant's actions had a discriminatory effect
> and were motivated by a discriminatory purpose . . . .  The discriminatory
> purpose need not be the only purpose, but it must be a motivating factor
> in the decision.  To withstand a motion for summary judgment, a plaintiff
> in a § 1983 suit challenging alleged racial discrimination in traffic stops
> and arrests must present evidence from which a jury could reasonably
> infer that the law enforcement officials involved were motivated by a
> discriminatory purpose and their actions had a discriminatory effect.

*Marshall v. Columbia Lea Reg. Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003).  Plaintiff's

equal protection claim is premised on the allegation that his book was confiscated

because he was of Mexican descent or because of his belief in Mexicanahuallotl.  *Doc. 14*

at 6-8.  However, he presents no evidence—only conclusory allegations—that the

decision to confiscate was connected to his ethnicity or religion.  *See Fitzgerald v. Corr.*

*Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (conclusory allegations without specific

supporting facts have no probative value and cannot create a genuine issue of fact).  The

only evidence on the matter is that Defendants believed the notebook was gang

contraband.[9]  In fact, as for the argument that the confiscation constituted religious

---

[9] To be precise, it appears that only Defendant Martin, who ordered the confiscation, held any relevant
intent.  Defendant Archuleta simply confiscated the book on Defendant Martin's orders.  *See doc. 29*, Ex. G
at 000530.  Defendant Mendoza only recommended denial of Plaintiff's grievance regarding the
confiscation.  "[A] denial of a grievance, by itself without any connection to the violation of constitutional

discrimination, Defendants did not even believe he was a sincere practitioner of the religion he now claims.

Given the lack of any evidence of discriminatory intent, Plaintiff's equal protection claim based on the confiscation cannot succeed.  Therefore, I recommend dismissing Plaintiff's equal protection claims against Defendants Joey, Martin, Archuleta, and Mendoza.

### C.  <u>First Amendment Retaliation</u>

Plaintiff argues that Defendants Martin, Archuleta, and Mendoza retaliated against him when they confiscated his composition notebook and did not promptly consider his grievances.  Specifically, Plaintiff complains that Defendants removed his composition book from his cell on either July 17 or 18, 2012, less than two weeks after he had exhausted administrative remedies regarding his denial of Native American programming and stated his intention to file suit in the instant matter.  *See doc. 29*, Ex. B-1 at 000154.

 "Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights."  *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).  In particular, "prisoners have the constitutional right to petition the Government for

---

rights alleged by plaintiff, does not establish personal participation under § 1983."  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

redress of their grievances." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984).  To prevail on a retaliation claim, the inmate "must allege *specific facts* showing retaliation because of the exercise of the [inmate]'s constitutional rights." *Fogle*, 435 F.3d at 1264 (quoting *Peterson*, 149 F.3d at 1144) (emphasis in original).  The inmate must show that (1) he was "engaged in constitutionally protected activity"; (2) the defendants' actions caused him to suffer an "injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity"; and (3) the defendants' actions "were substantially motivated as a response to [his] protected conduct." *See McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (internal quotations omitted).  The third prong must be satisfied by showing that "but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *See Peterson*, 149 F.3d at 1144 (internal quotations omitted).

It is uncontested that Plaintiff engaged in a constitutionally protected activity by filing his grievances.  Plaintiff also adequately alleges an injury—namely, the confiscation of his personal property.  Where Plaintiff's claim fails, however, is at the third prong of the analysis.  He is unable to show that, but for Defendants' alleged retaliatory motive relating to Plaintiff's grievances, his composition book would not have been taken.  The most Plaintiff can show is temporal proximity between the exhaustion of Plaintiff's claims and the confiscation of his notebook, which the Tenth Circuit has consistently held does not, in itself, demonstrate the requisite causal nexus

for a retaliation claim.  *See, e.g., Friedman v. Kennard*, 248 F. App'x 918, 922 (10th Cir. 2007).  Plaintiff provides no evidence that Defendants threatened him or sought to retaliate against him.  Plaintiff does not even confirm that Defendants had knowledge that Plaintiff had exhausted his grievances.  Plaintiff's alleged retaliatory motive is thus based solely on conjecture, which is insufficient to allow the contention to survive summary judgment.  *Argo*, 452 F.3d at 1200.

Defendants also provided a legitimate, non-retaliatory reason for confiscating Plaintiff's notebook: the notebook, which Plaintiff  himself admits to having composed, contains writings  related to the Sureños, which is the very gang to which Plaintiff himself admitted to being an "inactive member."  On this record, it cannot be said that Defendants had a retaliatory motive, let alone that such a motive was the but-for cause of the confiscation of Plaintiff's notebook.  I therefore recommend that Plaintiff's claims of retaliation against Defendants Martin, Archuleta, and Mendoza be dismissed.

### D. <u>Due Process</u>

Plaintiff alleges that Defendants Martin, Archuleta, and Mendoza violated his constitutional rights when they confiscated his composition notebook as gang paraphernalia.  Although Plaintiff refers to his Fourth Amendment right to be free from unreasonable search and seizure, his claims are more properly evaluated under a due process framework.  *See, e.g., Hudson v. Palmer*, 468 U.S. 517, 530 (1984) (concluding

prisoner "does not have a reasonable expectation of privacy [in his prison cell] enabling him to invoke the protections of the Fourth Amendment.").

The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  The "standard analysis under that provision proceeds in two steps:  We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011).  In the prison context, "[t]he intentional deprivation of property is not a fourteenth amendment violation if adequate state post-deprivation remedies are available."  *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir. 1989); *see also Hudson v. Palmer*, 468 U.S. 517, at 533 (1984).

Here, I accept that Plaintiff has a valid property interest in his composition notebook.  However, Plaintiff's claim fails the second step of the analysis.  Both prison grievance procedures and remedies under the New Mexico Tort Claims Act provide adequate post-deprivation remedies.  *See Hudson*, 468 U.S. at 536 n.15; *Jernigan v. Martinez*, 11-cv-828, *doc. 29* at 17 (D.N.M. Dec. 12, 2012) (citing N.M. Stat. Ann. § 41-4-12 & 33-3-28(A)).  Because Plaintiff could potentially pursue a claim under the New Mexico Tort Claims Act regarding the confiscation of his property, and has pursued his remedies within the prison grievance system, Plaintiff's due process rights have not been violated, and I recommend dismissal of this claim.

E.  **Right of Access to the Courts**

Plaintiff claims that Defendant Joey violated his constitutional rights by engaging in an "ongoing pattern of delayed response" to Plaintiff's multiple requests for Native American programming.  *Doc. 29*, Ex. B-1 at 2.  Although Plaintiff describes his claim as a due process violation, it is more appropriately addressed under the framework of denial of access to the courts.[10]

Access to the courts is a fundamental constitutional right.  *Lewis v. Casey*, 518 U.S. 343 (1996).  To state a denial of access claim, Plaintiff "must show that any denial or delay of access to the court prejudiced him in pursuing litigation."  *Treff v. Galetka*, 74 F.3d 191, 194 (10th Cir. 1996).  Here, Plaintiff argues that, by failing to reply to Plaintiff's correspondence and requests for Native American programming in a timely manner, Defendant Joey has hindered Plaintiff in exhausting his institutional remedies and "prohibit[ed] [Plaintiff] from filing of litigation to address" his claim that NMCD policy CD-101100 is an unconstitutional form of racial discrimination.  *Doc. 29*, Ex. B-1 at 000159-60.  As that issue is currently before the Court, the delay manifestly did not prohibit Plaintiff from litigating his claim in federal court.  Nor has Plaintiff alleged any prejudice due to the alleged delay.  For these reasons, I recommend granting summary judgment on this claim in favor of Defendant Joey.

---

[10] Plaintiff does not claim that Defendant Joey deprived him of "life, liberty, or property, without due process of law."  Rather, he claims that the delay hindered him in exhausting his institutional remedies so as to permit him to file a claim in federal court.

## VI.    CONCLUSION

For the foregoing reasons, I recommend GRANTING Defendants' Motion for Summary Judgment (*docs. 29, 30*), DISMISSING Plaintiff's amended complaint with prejudice (*docs. 13, 14*), DENYING Plaintiff's Motion for Writ of Mandamus without prejudice (*doc. 32*), and DENYING AS MOOT Plaintiff's Motion for Jury Demand (*doc. 38*).

_____

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**