IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SHAWN ANTHONY GONZALEZ,

      Plaintiff,

v.                                       Civ. No. 12-834 RB/GBW

TEX A. JOEY,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      This matter was referred to the undersigned "to conduct a bench trial and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case." *Doc. 63* at 1.  The undersigned conducted a bench trial on November 18-19, 2015 and considered Plaintiff's Proposed Findings of Fact and Conclusions of Law (*doc. 119*), Defendant's Proposed Findings of Fact and Conclusions of Law (*doc. 120*), and Defendant's Written Closing Statement (*doc. 121*).  The undersigned herein sets forth its proposed findings of fact, conclusions of law, and recommended disposition.  Because I conclude that Defendant has violated Plaintiff's rights under the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), I recommend judgment in favor of the Plaintiff be entered.

## I.   INTRODUCTION

This case concerns allegations by Plaintiff Shawn Gonzalez, an inmate at the New Mexico State Penitentiary, regarding his denial of access to Native American religious programming by Defendant Tex Joey of the New Mexico Department of Corrections.  Plaintiff filed suit alleging that this denial violated his First Amendment right to freely exercise his religious beliefs, his Fourteenth Amendment right to equal protection under the law, and his statutory religious rights under RLUIPA.

On November 18-19, 2015, the undersigned held a bench trial on these issues. Having heard witness testimony, reviewed the parties' exhibits accepted into evidence at trial, heard Plaintiff's and Defendant's respective arguments, and reviewed the trial pleadings and relevant law, the undersigned recommends the following findings of fact and conclusions of law.

## II.   PROPOSED FINDINGS OF FACT

For the significant disputed facts, in subparts under the numbered facts, I will address the most critical evidence upon which the finding is based and why certain potentially contradictory evidence was rejected.

### A.  Background

1.  Plaintiff, Shawn Anthony Gonzalez, is a citizen of the State of New Mexico and an inmate in the custody of the New Mexico Corrections Department ("NMCD").  Plaintiff is of Mexican descent and does not belong to any

2

federally-recognized Native American tribe.  *Doc. 116* at pp. 83:21-85:19; *doc. 117* at pp. 29:25-30:9.  Plaintiff is housed in Level VI of the New Mexico State Penitentiary, which is the Maximum Security portion of the facility.

2.  Defendant, Tex A. Joey, is a citizen of the State of New Mexico and was, at all relevant times, employed as the Native American Program Coordinator at NMCD.

3.  Growing up in Los Angeles, Plaintiff joined a street gang called "Quiet Village," which is a subsection of the California Sureños gang, a Mexican-American criminal organization based in Southern California.  *Doc. 116* at pp. 29:3-30:22; 64:7-2; *doc. 117* at pp. 101:19-102:3.

4.  The Sureños often have tattoos depicting various aspects of Aztec symbolism and culture.  *Doc. 117* at pp. 104:13-24; 200:6-202:5.  In addition, the use of the indigenous Mesoamerican language Nahuatl is very common among the Sureños as part of their gang indoctrination.  *Doc. 117* at p. 202:6-18.

5.  In 2007, Plaintiff decided to leave the Sureños and renounced his membership in the group.  *Doc. 116* at pp. 31:23-32:10.

6.  In 2012, NMCD conducted a search (known colloquially as a "shakedown") of Plaintiff's cell and confiscated a notebook containing

3

gang paraphernalia as well as written materials often associated with Sureños gang members. *Doc. 116* at pp. 129:4-133:21; *doc. 117* at pp. 105:10-111:24; 114:22-115:4. It is unclear when these symbols and writings were transcribed into the notebook. *Doc. 117* at pp. 115:5-13; 216:14-17.

7. New Mexico's Native American Counseling Act requires NMCD to provide Native American religious services to inmates to the extent that such services do not threaten the security of the institution. *Doc. 117* at p. 154:20-25; Stip. Ex. 5. The statute does not limit access to such programming on the basis of race or ethnicity. *Doc. 117* at p. 155:1-4; Stip. Ex. 5.

8. NMCD Department Policy CD-101100/101101 states that "[o]nly those persons who have submitted satisfactory and sufficient documentation of Native American Heritage to the Corrections Department shall be allowed to participate in Native American Religious Programs or to have personal religious items (as herein defined) in their possession." *See* Stip. Ex. 2.

9. The Santa Fe Penitentiary provides three sweat lodges for use as part of the prison's Native American religious programming. *Doc. 117* at pp. 21:24-22:2. The sweat lodges are not permanent structures, but rather areas consisting of branches set up in a triangular fashion and covered by a tarp. *Doc. 117* at pp. 55:3-20; 164:11-21. Heated rocks are brought into

the sweat lodge in order to generate steam and heat for the participants. *Doc. 117* at p. 55:21-24.

10. In August 2009, Plaintiff filed a petition requesting that Defendant allow him to attend the sweat lodge, and Defendant responded with a letter stating that Plaintiff must provide proof that he is of Native American descent in order to participate in activities designated as Native American religious programming. *Doc. 116* at pp. 59:20-60:4; 79:5-16.

11. Plaintiff then attempted to gain access to the sweat lodge by falsely claiming to be a member of a federally-recognized Native American tribe and providing a false tribal census number, but his application was denied. *Doc. 116* at pp. 61:16-25; 81:25-82:4. Plaintiff thereafter submitted a letter requesting inclusion in Native American religious programming under provisional status as Nahua, an indigenous group located in Mexico and Central America. *Doc. 116* at pp. 83:21-86:10; *doc. 117* at p. 30:13-22. His efforts were unsuccessful, as Defendant again denied his application. *Doc. 116* at pp. 83:21-86:10.

12. Plaintiff filed a grievance complaining that he had been prohibited from accessing Native American religious programming, which NMCD denied on July 6, 2012. *Doc. 117* at p. 44; Stip. Ex. 3.

13. Plaintiff recently obtained a tattoo on his back which he characterizes as religiously symbolic, but Defendant alleges that this tattoo signifies his ongoing gang affiliation.  *Doc. 116* at pp. 35:1-23; 128:16-24; *doc. 117* at pp. 93:15-94:8.

**B. *Sincerity of Plaintiff's Religious Beliefs***

14. The Court finds Plaintiff's description of his religious beliefs in Anahuac Theology to be credible.

   *a.* Plaintiff's testimony demonstrated thorough knowledge of Anahuac Theology and consistency in explaining religious terms and beliefs.  *Doc. 116* at pp. 39:7-41:13.  Plaintiff provided several examples of the forms of the creator under his religious doctrine and explained that Anahuac Theology includes oral traditions regarding creation and life after death.  *Doc. 116* at pp. 47:2-50:7.

   *b.* Further, Plaintiff's demeanor while testifying in court displayed truthfulness and sincerity.  Throughout his testimony and examination, Plaintiff remained confident and engaged, and he demonstrated sincere passion while sharing the tenets of his faith and defending the authenticity of his beliefs.

   *c.* While Plaintiff's previously-obtained tattoos indisputably functioned as gang monikers, this fact does not preclude Plaintiff's

6

assertion that his most recent tattoo is a religious symbol.  *Doc. 116* at pp. 118:22-122:4; 152:13-156:18.  Plaintiff explained in great detail how this new tattoo depicts the creation story of Mexican theology. *Doc. 116* at pp. 37:4-39:2.  Dr. George Sieg, an expert in religious studies specializing in new religious movements, confirmed that the tattoo represents an important religious symbol in indigenous traditions.  *Doc. 116* at pp. 205:12-206:10.  Thus, regardless of whether the symbol portrayed in Plaintiff's most recent tattoo is associated with gang culture, it holds legitimate religious significance to Plaintiff and therefore fails to undermine his sincerity of belief.

d.   Defendant attempts to demonstrate that Plaintiff does not have a sincere belief in Anahuac Theology due to his associations with the Sureños gang along with his extensive history of violence. However, these assertions present a false choice, as Plaintiff's past use of gang symbols and violent behavior would not necessarily preclude his sincere belief in the teachings of Anahuac Theology. *See, e.g., Ciempa v. Jones*, No. 08-CV-0685-CVE-TLW, 2011 WL 4014449, at *5 (N.D. Okla. Sept. 9, 2011), *aff'd*, 477 F. App'x 508 (10th Cir. 2012).

e.  Plaintiff first attended a sweat lodge in 1995, but did not regularly

participate in the practice until 2005. *Doc. 116* at pp. 73:7-77:14.

Plaintiff explained how Anahuac Theology has impacted his life, as

he believes he has become more patient, understanding, and

peaceful. *Doc. 116* at p. 62:3-19.  Plaintiff also stated that he had

been estranged from his daughters from 1994 until 2005, and that

he believes his practice of Anahuac Theology helped him reunite

and strengthen his relationships with them. *Doc. 116* at pp. 62:20-

63:14.

f.  Plaintiff's past expressions of belief in Christianity and other

religions, either to prison officials or to his wife, do not significantly

undermine his credibility as to his current religious beliefs. *Doc.*

*116* at pp. 89:2-95:12; 139:22-146:20.  Plaintiff's intake form prepared

by the institution categorizes him as Christian and he has been

recorded while discussing Christian principles with his wife, an

undisputedly devout Christian. *Doc. 117* at pp. 71:1-72:10.

However, such evidence easily avails itself to alternate

explanations which do not preclude Plaintiff from holding a sincere

belief in Anahuac Theology.  These explanations include the

possible mischaracterization or evolution of his beliefs following

8

the intake process, as well as the possibility that he discussed Christianity with his wife merely as an accommodation of her beliefs.

  *g.* Plaintiff's vigorous pursuit of his right to attend Native American religious programming is evidence in itself that he is motivated by a sincere belief in Anahuac Theology.  While Defendant has argued that Plaintiff pursued this lawsuit simply to challenge the system and bolster his own credentials within the prison hierarchy, Defendant has not sufficiently demonstrated any such ulterior motive.  *Doc. 117* at p. 210:8-20.

15. Dr. Sieg testified that Plaintiff's expression of the purifying experience of the sweat lodge is consistent with descriptions of other practitioners of Native American religious programming.  *Doc. 116* at pp. 199:6-200:22. Dr. Sieg also testified that references to monotheism are consistent with the conduct of sincere practitioners of indigenous religious, including Anahuac Theology, and that folk religions very commonly incorporate Christian elements into their traditional ideologies.  *Doc. 116* at pp. 204:12-205:11; 208:5-16.  Finally, Dr. Sieg confirmed that Plaintiff's view of the afterlife is consistent with Aztec and Mayan cosmology.  *Doc. 116* at p.207:1-6.

16. Mr. Alfonso Valdez, a gang expert, testified that he believes Plaintiff remains an active member of the Sureños gang despite his formal renunciation of membership. *Doc. 117* at p. 204:9-11. Mr. Valdez supports this conclusion in part by testifying that the contents of Plaintiff's notebook suggest gang membership and that Plaintiff's recent tattoo constitutes a gang symbol. *Doc. 117* at pp. 204:13-206:23; 209:1-17. Mr. Valdez does not disprove, however, that Plaintiff's recent tattoo could also (or alternatively) have religious significance to Plaintiff. Even assuming Mr. Valdez's testimony established Plaintiff's continuing membership in a gang, it does not disprove Plaintiff's sincere belief in Anahuac Theology.

17. Defendant himself testified that he believed Plaintiff's request to participate in Native American religious programming to be sincere. *Doc. 117* at p. 31:19-20.

### C. *Substantial Burden on Plaintiff's Religious Beliefs*

18. The Native American sweat lodge is considered a sacred space for Plaintiff to practice his religion. *Doc. 117* at p. 33:19-21.

    *a.* Plaintiff testified that the smudge ceremony and the sweat ceremony are essential to his religion, as they provide purification and cleansing for participants. *Doc. 116* at pp. 50:8-52:19.

    *b.*  Plaintiff testified that the sweat ceremony has had a tremendous impact on him and changed the way he views life.  *Doc. 116* at pp. 41:21-42:8.

    *c.*  Dr. Sieg testified that the sweating and smudging ceremonies are commonplace among indigenous religions in North America.  *Doc. 116* at pp. 199:9-200:22; 206:11-23.

### D.  *Legitimate Penological Interests of Defendant*

19. Gangs threaten the security of NMCD by engaging in criminal activities such as drug trafficking, extortion, and various acts of violence.  *Doc. 117* at pp. 65:3-10; 170:18-22.

20. NMCD considers the Sureños gang to be a high security threat to the prison.  *Doc. 117* at pp. 65:11-18; 83:9-13.  Members of the Sureños have committed violent acts during religious programming in the past, including in the prison chapel.  *Doc. 117* at p. 4-6.  However, since NMCD did not implement a restriction excluding certain inmates from using the chapel even after these incidents, the fact that the incidents occurred is not persuasive to justify excluding Plaintiff from preferred religious programming.  *Doc. 117* at pp. 79:10-13; 116:15-20; 133:21-23.

21. Defendant presented undisputed evidence that Plaintiff has a history of gang membership and violent activity.  This evidence includes prior

convictions for armed robbery, felon in possession, escaping from a county jail, and murder of a rival gang member. *Doc. 116* at pp. 68:3-69:22. This evidence also includes misconduct while incarcerated, including assaults against other inmates, threats against corrections officers, possession of narcotics or narcotic paraphernalia, tampering with evidence, possession of weapons, and attempts to recruit members to the Sureños prison gang. *Doc. 116* at pp. 66:2-4; 72:17-23; 96:12-100:6; 104:9-109:24; 114:19-117:14; *doc. 117* at pp. 61:23-62:10; 136:21-138:7.

22. After Plaintiff renounced his gang membership, the Sureños gang targeted Plaintiff for violent retribution, placing him on an "active hit list." *Doc. 117* at pp. 86:17-25; 87:10-12; 101:11-14. Another inmate, Freddie Granger, assaulted Plaintiff in 2007 because Plaintiff was no longer in good standing with the Sureños. *Doc. 116* at pp. 32:11-33:10; *doc. 117* at pp. 91:15-92:24.

23. NMCD's Restoration into Population Program ("RPP") was designed to release inactive and non-predatory gang members from Maximum Security to a general population setting. *Doc. 117* at pp. 51:5-52:15; 125:4-11. The RPP is intended to prepare inmates for release to the community and also to avoid the risk of mental health issues arising from prolonged periods of isolation. *Doc. 117* at pp. 59:9-60:3.

24. An inmate can be admitted to the RPP by indicating a desire to leave the gang lifestyle. *Doc. 117* at p. 53:10-12.  In February 2014, Plaintiff was admitted into the RPP after NMCD determined that he was non-predatory and was an inactive gang member. *Doc. 116* at p. 56:4-6; *doc. 117* at pp. 54:6-16; 132:7-16.

25. In April 2015, Plaintiff was removed from the RPP for possession of gang paraphernalia after he obtained a tattoo of the Aztec calendar, which NMCD considered indicative of ongoing gang membership. *Doc. 116* at pp. 56:25-57:22; 118:2-11; *doc. 117* at pp. 64:19-65:2; 112:12-15; 118:1-4; 133:15-25; 138:8-9.

26. Defendant is unaware of any misconduct having ever occurred within the prison's sweat lodge, such as violent acts, drug trafficking, or facilitating escape from the prison. *Doc. 117* at pp. 18:20-19:16; 79:17-80:3; 95:24-96:1; 127:19-25.

27. In justifying Plaintiff's exclusion from programming, NMCD also stated its concern about respecting Native American culture and the response of Native Americans if the policy were to be changed. *Doc. 117* at p. 68:9-24.

E.  *Least Restrictive Means / Narrowly Tailored to Achieve a Compelling Interest*

28. Level VI inmates, such as Plaintiff, are allowed to attend the sweat lodge once every forty-five days, and must attend the sweat lodge individually or in a one-on-one session with Defendant.  *Doc. 117* at pp. 17:19-18:7; 24:22-25:1; 50:22-25; 96:5-11; 165:16-24; 166:17-23.  The ability to attend sweat lodge individually or supervised by Defendant would remedy any security concerns.  *Doc. 117* at pp. 96:12-97:17.  In addition, NMCD assigns a staff member to either be stationed outside the sweat lodge or to patrol the area.  *Doc. 117* at p. 56:19-24.

29. Under a former policy, Defendant has allowed non-Native American inmates to attend the sweat lodge.  *Doc. 117* at pp. 35:5-10; 38:3-9.  For example, Jimmy Kinslow, an inmate whose ethnicity was described as "white, non-Hispanic," has attended the sweat lodge as recently as 2013-2014.  *Doc. 117* at pp. 166:2-16; 171:9-172:3.

30. Defendant does not find it offensive to allow non-Native American inmates to participate in the sweat lodge as long as they hold a sincere religious belief, and also does not find it offensive to allow Native Americans who are Christians to participate in Native American religious programming.  *Doc. 117* at pp. 17-23; 40:15-22.  Defendant does not require

Native American inmates to demonstrate sincerity of belief in order to access Native American religious programming. *Doc. 117* at pp. 12:11-21.

31. There is no evidence that the change in policy limiting participation in religious programming to those of Native American descent was due to disruptive effects of non-Native Americans attending the sweat lodge while in prison. *Doc. 117* at pp. 36:24-38:9.  Rather, the change resulted from certain Native American tribes complaining about non-Native American former inmates who were operating their own sweat lodges outside of prison in a fashion which upset tribal members. *Doc. 117* at pp. 37:11-38:2.

**F.  *Different Treatment of Similarly Situated Inmates***

32. By denying his application, Defendant treated Plaintiff differently from similarly situated inmates who wish to participate in Native American religious programming.

   a.  The language of the prison policy allows Christians or members of other religions who do not hold a sincere belief in an indigenous religion to nonetheless participate in Native American religious programming as long as they are Native American. *Doc. 117* at pp. 11:12-13:5.

b.   Native Americans who are indisputably active members of gangs
     are permitted to attend the sweat lodge.  *Doc. 117* at p. 95:12-23.
     Likewise, Native American inmates in Level VI placement have
     been allowed to access the sweat lodge individually.  *Doc. 117* at
     pp. 166:24-167:1.

c.   While inmates at higher security levels may be given fewer
     opportunities to attend the sweat lodge, inmates are not altogether
     excluded from sweating on the basis of their security level.  *Doc.
     117* at pp. 25:2-26:14; 54:21-24; 76:23-24.  Under NMCD's
     disciplinary policy, an inmate may be temporarily suspended from
     privileges and activities for the duration of the disciplinary period,
     but no disciplinary action would result in a permanent bar on an
     inmate's access to such privileges or activities.  *Doc. 117* at p. 157:9-
     21.

d.   Mr. Shannon McReynolds, an expert in New Mexico Corrections
     practices and policies, testified that on one occasion, approximately
     sixteen years ago, inmates who were members of a Native
     American gang assaulted staff members while on their way to
     attend a sweat lodge.  *Doc. 117* at p. 153:12-18.  Even after this
     incident, the inmates involved were allowed to attend the sweat

lodge again after finishing their disciplinary period.  *Doc. 117* at p. 162:1-18.

**G.  *Denial on Basis of Race***

33. Defendant denied Plaintiff access to Native American religious programming solely on the race-based determination that he is not Native American.

> e.  Under the prison policy, an inmate must be a documented member of a federally-recognized Native American tribe or people in order to enroll in Native American religious programming.  *Doc. 117* at pp. 8:3-6; 49:3-13.

> f.  Defendant requires only that an inmate provide either a census number or a *bona fide* tribal order.  *Doc. 117* at pp. 8:18-21. Defendant does not consider an inmate's participation in gang activities when determining whether they can participate in Native American religious programming, and Defendant likewise did not consider Plaintiff's gang activity in denying him access.  *Doc. 117* at pp. 19:25-20:18.

> g.  Defendant met with Plaintiff regarding his request to participate in Native American religious programming, and requested that Plaintiff prove that he is Native American.  *Doc. 117* at pp. 14:7-15.

h.  NMCD followed its policy and denied Plaintiff's grievance because he could not provide sufficient documentation demonstrating that he was Native American by race.  *Doc. 117* at pp. 45:8-46:2.  NMCD did not deny Plaintiff's grievance on the basis of his past misrepresentations of being Native American, his lack of sincere belief, or that he was a security threat.  *Doc. 116* at p. 60:10-25; *doc. 117* at pp. 47:6-48:19.

III.  RECOMMENDED CONCLUSIONS OF LAW

1.  The Court has jurisdiction under 28 U.S.C. § 1331.

2.  Plaintiff brought this case pursuant to 42 U.S.C. § 1983, alleging the following:

   i.  Defendant violated Plaintiff's rights under the free exercise clause of the First Amendment to the United States Constitution by denying Defendant access to Native American religious programming.

   ii.  Defendant violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., by denying Plaintiff access to Native American religious programming.

   iii.  Defendant violated Plaintiff's rights under the equal protection clause of the Fourteenth Amendment to the United States

18

Constitution by denying Defendant access to Native American religious programming.

**A.    *Plaintiff's Free Exercise Claim***

1.    To establish a constitutional violation based on a free exercise claim, Plaintiff must first demonstrate that the prison regulation "substantially burdened [his] sincerely-held religious beliefs." *Kay v. Bemis,* 500 F.3d 1214, 1218 (10th Cir. 2007) (internal citations omitted).  If Plaintiff makes this showing, Defendant may then "identify the legitimate penological interests that justified the impinging conduct." *Id.*

2.    At this step, the Court must balance the four factors set forth in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987), to assess the reasonableness of the prison regulation.  *Id.* at 1219.  These factors are:

   i.    Whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

   ii.   Whether there are alternative means of exercising the right that remain open to the inmates;

   iii.  The impact that accommodation of the asserted constitutional right would have on the guards and on other inmates, as well as on the resources of the prison; and

    iv.    The availability of ready alternatives for furthering the government

           interest.

*Beard v. Banks*, 548 U.S. 521, 529 (2006) (citing *Turner*, 482 U.S. at 89-90).

3.   Plaintiff holds a sincere religious belief in Anahuac Theology / Pan-

     Mesoamerican Shamanism.

4.   Defendant's adherence to Department Policy CD-101100/101101

     substantially burdens Plaintiff's sincerely held belief by denying him

     access to Native American religious programming.

5.   Defendant has failed to identify legitimate penological interests which

     justify denying Plaintiff access to Native American religious

     programming.

    i.    The prison has a legitimate government interest in protecting

          Native American culture and in preventing inmates from using the

          sweat lodge for the purpose of furthering gang activity. However,

          the prison's policy as written is purely race-based and therefore has

          no valid, rational connection to the legitimate interests.

    ii.    Plaintiff has no alternative means to free exercise of his religion, as

          his beliefs dictate that the sweat and smudge ceremonies are the

          only means of purification. Plaintiff cannot attend the sweat lodge

without Defendant granting him approval to access Native

American religious programming.

iii.  An accommodation for non-Native Americans with sincere beliefs

would have little impact on guards, inmates, and prison resources,

as inmates are often allowed to visit the sweat lodge individually or

one-on-one with Defendant.

iv.  There are several alternatives for furthering the legitimate

government interests.  For example, the prison could adopt a policy

which (1) excludes all prisoners at the high security classifications;

(2) conducts an individualized and tailored assessment of security

risk, including considering gang membership, in determining

whether to grant access to programming; (3) requires gang

members and former gang members to attend the sweat lodge

individually or accompanied; or (4) permits exclusion of prisoners

without a sincere belief or who cause disruptions while

participating in the programming.

6.  Balancing these factors, the undersigned concludes that Department

Policy CD-101100/101101 is an unreasonable regulation and thus is an

unconstitutional restriction on Plaintiff's right to exercise his religion.

Therefore, I recommend that the Court order that Plaintiff may not be

prohibited from participating in Native American religious programming under this policy as currently written.[1]

**B.**  *Plaintiff's RLUIPA Claim*

1.  The required preliminary showing under RLUIPA is identical to that of the free exercise clause: that the restriction substantially burdened Plaintiff's sincerely held religious beliefs.  *See Yellowbear v. Lampert*, 741 F.3d 48, 54-55 (10th Cir. 2014); *Ford v. Fed. Bureau of Prisons*, No. 08-882, 2011 WL 2415790, at *9 (D. Colo. May 24, 2011), *report and recommendations adopted by Ford v. Fed. Bureau of Prisons*, No. 08-882, 2011 WL 2358166 (D. Colo. June 10, 2011).

2.  If Plaintiff has demonstrated that the restriction substantially burdened his sincerely held religious beliefs, the burden of persuasion shifts to the Defendant to demonstrate that the prison policy is the least restrictive means of furthering a compelling government interest.  42 U.S.C. § 2000cc-1(a)(1)–(2) (2000).  This inquiry should consider "whether the prison's claimed . . . interests qualify as compelling in the context of particular cases, not in the abstract."  *Yellowbear*, 741 F.3d at 58.

---

[1] This order would not constitute a requirement that Plaintiff be permitted to participate in Native American programming indefinitely.  Should Defendant promulgate a policy which does not violate the First Amendment, and Plaintiff is fairly excluded on the basis of that policy, such would not violate this recommendation should the Court follow it.

3.  Plaintiff holds a sincere religious belief in Anahuac Theology / Pan-

    Mesoamerican Shamanism.

4.  Defendant's adherence to Department Policy CD-101100/101101

    substantially burdens Plaintiff's sincerely held belief by denying him

    access to Native American religious programming.

5.  The prison has a compelling government interest in protecting Native

    American culture and in preventing inmates from using the sweat lodge

    for the purpose of furthering gang activity.  However, the prison's policy

    as written arbitrarily denies non-Native Americans from accessing such

    programming while permitting participation by Native Americans

    regardless of gang affiliation or other security risk.  Further, as noted *supra*

    (*see* Section III:A:5:iv), the prison retains several alternative policies

    available that would adequately protect the stated interests.   Therefore,

    the policy currently employed is not the least restrictive means of

    furthering those interests.

6.  For these reasons, I conclude that Department Policy CD-101100/101101

    violates Plaintiff's right to exercise his religion under RLUIPA.  Therefore,

    I recommend that the Court order that Plaintiff may not be prohibited

from participating in Native American religious programming under this

policy as currently written.[2]

C.  *Plaintiff's Equal Protection Claim*

1.  "To sustain a claim under the Equal Protection Clause, a plaintiff must

    provide evidence that he was treated differently from others who are

    similarly situated to him, and that the acts forming the basis of the

    plaintiff's claim were motivated by a discriminatory purpose." *Marshall v.*

    *Columbia Lea Reg'l Hosp.*, 345 F.3d 1157 (10th Cir. 2003).

2.  To assert an equal protection claim, Plaintiff "must first make a threshold

    showing that [he was] treated differently from others who were similarly

    situated to [him]." *Brown v. Montoya,* 662 F.3d 1152, 1172–73 (10th

    Cir.2011) (internal quotation marks omitted).  If Plaintiff makes this

    showing, the burden transfers to Defendant to show that his actions were

    "narrowly tailored to achieve a compelling government interest." *KT & G*

    *Corp. v. Att'y Gen.*, 535 F.3d 1114, 1137 (10th Cir. 2008); *see also Riddle v.*

    *Mondragon,* 83 F.3d 1197, 1207 (10th Cir. 1996).  "The purpose of the

    narrow tailoring requirement is to ensure that the means chosen fit the

    compelling goal so closely that there is little or no possibility that the

---

[2] This order would not constitute a requirement that Plaintiff be permitted to participate in Native American programming indefinitely.  Should Defendant promulgate a policy which complies with the standards of RLUIPA, and Plaintiff is fairly excluded on the basis of that policy, such would not violate this recommendation should the Court follow it.

motive for the classification was illegitimate racial prejudice or stereotype." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (quotations and citations omitted).  Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives . . . ." *Id.* at 339.

3.  In adhering to Department Policy CD-101100-101101, Defendant treated Plaintiff differently from similarly situated inmates who wish to participate in Native American religious programming.

4.  The determinative factor in Defendant's decision to deny Plaintiff access to Native American religious programming was the fact that Plaintiff is not Native American.

5.  The prison has a compelling government interest in protecting Native American culture and in preventing inmates from using the sweat lodge for the purpose of furthering gang activity.  However, Department Policy CD-101100/101101 as written is purely and explicitly race-based, foregoing inquiries into sincerity of belief and potential security risk for those able to prove membership in a federally recognized Native American tribe.  The policy is therefore not narrowly tailored to achieve those interests.

6.  For these reasons, I conclude that Department Policy CD-101100/101101 violates Plaintiff's right to equal protection.  Therefore, I recommend that the Court order that Plaintiff may not be prohibited from participating in

Native American religious programming under this policy as currently

written.[3]

## V.  CONCLUSION

Based on the foregoing, the undersigned recommends that the Court enter

judgment in favor of Plaintiff as to each of Plaintiff's claims.

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.  Objections, if any, are to be filed concurrently.  However, should a party wish to respond to the objections filed by the opposing party, the response shall be filed within three days of the filing of the objections.**

---

[3] This order would not constitute a requirement that Plaintiff be permitted to participate in Native American programming indefinitely.  Should Defendant promulgate a policy which does not violate the Equal Protection Clause, and Plaintiff is fairly excluded on the basis of that policy, such would not violate this recommendation should the Court follow it.